1

2

3

4

5

6

7

8           # UNITED STATES DISTRICT COURT

9               EASTERN DISTRICT OF CALIFORNIA

10

11  CAROLYN LOUISE RAY,                    Case No.  1:12-cv-01173-SAB

12              Plaintiff,                 ORDER DENYING PLAINTIFF'S SOCIAL
                                           SECURITY APPEAL
13          v.
                                           (ECF Nos. 17, 20, 21)
14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                Defendant.
16

17

18                              **I.**

19                       **INTRODUCTION**

20          Plaintiff Carolyn Louise Ray ("Plaintiff") seeks judicial review of a final decision of the

21  Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for

22  disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on

23  the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A.

24  Boone.[1]

25          Plaintiff suffers from degenerative disc disorder, asthma, chronic obstructive pulmonary

26  disease, obesity, affective mood disorder, personality disorder, and a history of polysubstance

27  _____

28  [1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 9, 10.)

dependence.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on January 12, 2009.  (AR 165.)  Plaintiff's applications was initially denied on June 26, 2009, and denied upon reconsideration on October 8, 2009.  (AR 99-102; 105-08.) Plaintiff requested and received a hearing before Administrative Law Judge William Wallis ("the ALJ").  Plaintiff appeared for a hearing on February 3, 2011.  (AR 30-79.)  On February 16, 2011, the ALJ found that Plaintiff was not disabled.  (AR 7-21.)  The Appeals Council denied Plaintiff's request for review on May 23, 2012.  (AR 1-3.)

A.   **Hearing Testimony**

1.   Plaintiff's Testimony

Plaintiff testified by video at the hearing on February 3, 2011.  (AR 35-72.)  At the time of the hearing, Plaintiff weighed 324 pounds and had gained 120 pounds over the previous 2 years. (AR 36.)  Plaintiff's normal weight was about 190 pounds.  (AR 36.)  Plaintiff's driver's license had been suspended and her mother drove her to the hearing.  (AR 36-37.)  Plaintiff received a CNA from Taft College, but lost it within a year.  (AR 37.)  Plaintiff later received her GED. (AR 37.)  Plaintiff had previously worked as a cashier and clerk for about twenty-eight hours per week, and as a crew manager doing inventories, working full-time.  (AR 37-38.)  Plaintiff also volunteered doing custodial work for about four months.  (AR 38.)

Plaintiff testified that her disability began on August 14, 2008 after she had a colonoscopy.  (AR 39.)  Following the procedure, she noticed that she was no longer able to walk distances or breathe properly while walking.  (AR 39.)  Plaintiff also has degenerative disc disease with nerve damage to her legs which was discovered when they did an MRI the middle of 2010.  (AR 40-41.)  Plaintiff has chronic obstructive pulmonary disease ("COPD") and adult form emphysema which began about the same time as her back problems.  (AR 41.)  Plaintiff has always had depression and it was at its worse just before she had her colonoscopy.  (AR 41-42.)

Plaintiff has problems with her lower back that cause a sharp ache and problems with her

1   balance after walking about five minutes.  (AR 42-43.)  Plaintiff had just begun receiving

2   cortisone injections for her back pain.  (AR 43.)  Plaintiff uses a walker that she received in

3   December of 2011.  (AR 70.)  The walker was prescribed so she would have a place to sit down

4   and rest when she was out walking.  (AR 70.)  Prior to receiving the walker, she used a cane for

5   about six months.  (AR 70.)  Plaintiff began using the cane after she had fallen a few times

6   because she was unable to get up from a sitting position on the curb.  (AR 70-71.)

7          Plaintiff's breathing becomes labored when she walks.  (AR 43.)  Her breathing is worse

8   when it is hot and her asthma is triggered if she is in an air conditioned room.  (AR 60.)  Plaintiff

9   smokes a little over a pack of cigarettes a day.  (AR 61.)  Plaintiff is also having problems with

10   her hands, but has not seen the doctor for this issue.  (AR 61.)

11          Plaintiff is unable to stand in the shower for more than ten minutes and cannot get out of

12   the bathtub by herself.  (AR 45.)  Her husband helps her shower and does most of the cooking.

13   (AR 63.)  Plaintiff takes Percocet for her pain which allows her to walk and sit in a chair a little

14   longer.  (AR 45.)  Without her pain medication, Plaintiff rates her pain as seven out of ten.  (AR

15   45.)  With her pain medication, her pain is five out of ten.  (AR 45-46.)  Plaintiff is also taking

16   medication for anxiety and depression.  (AR 46.)  These medications cause her to see spots, and

17   have dry mouth, memory loss, and dizziness on occasion.  (AR 46.)  Plaintiff is taking her

18   medication as prescribed.  (AR 71.)  Plaintiff has been receiving counseling for the past three to

19   four years.  (AR 59-60.)  The counseling has been helpful.  (AR 60.)

20          In a typical day, plaintiff will sit on her daughters' bed and tell them where to put their

21   toys, vacuum the living room, do dishes, help the girls with their homework, and the rest of her

22   time is spent sitting there like a zombie and thinking about what she wishes that she could do.

23   (AR 65.)  Plaintiff does not talk on the phone or use the computer.  (AR 66.)  During the evening

24   she watches television.  (AR 66.)

25          Plaintiff's daughter does the laundry and cleaning and her husband does the grocery

26   shopping, although she will go with him occasionally if a cart is available to ride in.  (AR 67.)

27   Plaintiff does not participate in any hobbies and she does not go to church because she smokes.

28   (AR 67.)  Plaintiff had problems with alcohol and methamphetamine in the past.  (AR 68.)  She

3

1   has been clean and sober for a little over a year with a relapse in 2010.  (AR 68-69.)  Plaintiff has

2   completed Narcotics Anonymous and attends meetings at least twice a week.  (AR 69.)

3       Plaintiff is able to lift eight pounds, but is unable to carry any weight.  (AR 48.)  During

4   an eight hour workday, Plaintiff can stand for approximately two and one half hours, walk for

5   approximately two and one half hours, and sit for four hours.  (AR 49-55.)  During an eight hour

6   workday, Plaintiff would have one panic attack or breathing problem which would last from ten

7   to twenty minutes.  (AR 55-56.)  Plaintiff is unable to bend, kneel, crawl, or climb.  (AR 56-57.)

8   Plaintiff would be able to remember three of five items from a list.  (AR 57.)  Plaintiff is not able

9   to watch television for more than fifteen to twenty minutes at a time, not because of lack of

10  concentration, but because the television gets on her nerves after that amount of time.  (AR 57-

11  58.)  Plaintiff becomes uncomfortable if she is in a group of four to five people.  (AR 58.)

12  Plaintiff would miss three to four days a week if she was employed full time due to not being able

13  to get up on time or get out of bed due to her depression.  (AR 62-63.)

14      2.    Vocational Expert Testimony

15      Linda M. Ferra, a vocational expert ("VE"), also testified at the hearing.  (AR 72-78.)  The

16  ALJ presented a hypothetical of an individual the same age, education, language and work

17  background as Plaintiff.  The individual could lift, carry, push, or pull fifty pounds occasionally

18  and twenty-five pounds frequently; stand and/or walk six hours in an eight hour day; sit six hours

19  in an eight hour day and must avoid concentrated exposure to dust, fumes, gases, and odors.

20  Additionally, the individual could understand, remember and carry out simple tasks and job

21  instructions; maintain concentration, persistence and pace for a normal workday and a work

22  week; can interact adequately with supervisors and co-workers, but could only occasionally

23  interact with the public.  (AR 74.).

24      The VE opined that this individual would be unable to perform Plaintiff's past work.  (AR

25  74.)  There are light and unskilled jobs available in the national economy that this individual

26  could perform, such as an assembler with approximately 20,000 jobs in the state and 200,000

27  nationally; packing line worker with 43,000 jobs in the state and 430,000 nationally; and

28  housekeeping cleaner with 42,000 jobs in the state and 420,000 nationally.  (AR 74-75.)

The ALJ then presented a second hypothetical of the same individual, with an exertion level changed from medium to the full range of sedentary, but with the same mental residual functional capacity as the first hypothetical.  (AR 75.)  The VE opined that there would be sedentary and unskilled work available for this individual, such as an assembler with 2,700 jobs in the state and 27,000 nationally; nut sorter with 1,400 jobs in the state and 14,000 jobs nationally.  (AR 75.)  The remainder of the sedentary and unskilled jobs involve more than occasional public contact.  (AR 75.)

The ALJ then presented a third hypothetical of an individual who could lift eight pounds occasionally or frequently; could carry no weight; could stand and/or walk two hours and forty minutes total in an eight hour workday, five to ten minutes at a time; could walk two hours and forty minutes in an eight hour workday, twenty minutes at a time; could sit four hours in an eight hour workday; would require the ability to lie down at least once per eight-hour shift on an unscheduled break between ten and twenty minutes; and could occasionally stoop, but never kneel, crawl or climb.  (AR 76.)  The individual would be limited to simple, repetitive tasks sufficient for unskilled work and would be limited to occasional public contact. (AR 76.)  The VE opined there would be no work available for this individual.  (AR 76.)

Plaintiff's attorney presented a hypothetical of an individual who is unable to be effective or productive at work at least twenty percent of the time at any given moment on any given day.  (AR 77.)  The VE opined this individual would not be able to perform Plaintiff's previous work or any other jobs available in the economy.  (AR 77.)

**B.     ALJ Findings**

The ALJ found that Plaintiff met the last insured status requirements on March 31, 2009.  Through the date she was last insured Plaintiff suffered from asthma, chronic obstructive pulmonary disease, obesity, affective mood disorder, personality disorder, and a history of polysubstance dependence.  (AR 12.)  Plaintiff's impairments, alone or in combination did not meet or medically equal one of the listed impairments.  (AR 13.)  Through the date last insured, there were jobs available in significant numbers in the national community that Plaintiff could have performed.  (AR 20.)

1

**III.**

2

**LEGAL STANDARD**

3      Congress has provided that an individual may obtain judicial review of any final decision

4  of the Commissioner of Social Security regarding entitlement to benefits.  42 U.S.C. § 405(g).  In

5  reviewing findings of fact in respect to the denial of benefits, this court "reviews the

6  Commissioner's final decision for substantial evidence, and the Commissioner's decision will be

7  disturbed only if it is not supported by substantial evidence or is based on legal error."  Hill v.

8  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012).  "Substantial evidence" means more than a scintilla,

9  but less than a preponderance.  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal

10  quotations and citations omitted).

11      "Substantial evidence is relevant evidence which, considering the record as a whole, a

12  reasonable person might accept as adequate to support a conclusion."  Thomas v. Barnhart, 278

13  F.3d 947, 955 (9th Cir. 2002) (quoting Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453,

14  1457 (9th Cir. 1995)).  "[A] reviewing court must consider the entire record as a whole and may

15  not affirm simply by isolating a specific quantum of supporting evidence."  Hill, 698 F.3d at 1159

16  (quoting Robbins v. Social Security Administration, 466 F.3d 880, 882 (9th Cir. 2006).

17  However, it is not this Court's function to second guess the ALJ's conclusions and substitute the

18  court's judgment for the ALJ's.  See Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)

19  ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's

20  conclusion that must be upheld.")

21

**IV.**

22

**DISCUSSION AND ANALYSIS**

23      Plaintiff contends that the ALJ erred by failing to address the February 19, 2009 Short

24  Form Evaluation for Mental Disorders completed by her treating physician.  (Plaintiff's Opening

25  Brief 7-11, ECF No. 17.)  Defendant replies that the failure to address the February 19, 2009

26  evaluation was harmless error.   (Def.'s Opp. to Pl.'s Opening Brief 9-12, ECF No. 20.)

27  Additionally, Plaintiff alleges that the ALJ failed to articulate legally sufficient reasons for

28  rejecting Plaintiff's testimony.  (ECF No. 17 at 12-15.)  Defendant contends that the ALJ properly

evaluated Plaintiff's subjective complaints.  (ECF No. 20 at 13-16.)  The Court shall consider the

two issues separately.

### A.      Weight Given to Dr. Bangasan's Opinion

Dr. Bangasan completed two reports that are at issue here.  The first report which was

issued on August 14, 2008 is addressed by the ALJ in his opinion.  In his opinion, the ALJ stated

that he gave very little weight to the findings and restrictions of Dr. Bangasan's August 14, 2008

report.  (AR 17.)  Dr. Bangasan completed a second report on February 19, 2009 which is not

mentioned in the opinion.  Plaintiff contends that the ALJ erred by failing to address this second

report.

The general rule is that more weight should be given to the opinion of a treating physician.

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  Where the treating physician's opinion is

contradicted by another doctor, it may be rejected only for "specific and legitimate reasons"

supported by substantial evidence in the record.  Ryan v. Commissioner of Social Sec., 528 F.3d

1194, 1198 (9th Cir. 2008) (quoting Bayless v. Barnhart, 427 F.3d 1121, 1216 (9th Cir. 2005)).

The ALJ need not accept a treating physician's opinion that is brief, conclusory, and unsupported

by clinical findings.  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).

### 1.      August 14, 2008 Report

Dr. Bangasan saw Plaintiff on August 14, 2008, and completed a psychiatric/medication

evaluation.  (AR 318-325.)  Dr. Bangasan also completed a mental capacities report in which she

stated that Plaintiff reports staying in bed most every day due to depression and anxiety and has

difficulty attending to any daily tasks, both inside and outside of her home.  She also opined that

Plaintiff would have a difficult time adapting to a common work environment.  She would be

lacking in the areas of decision making, attendance, schedules, and relating to other employees

and supervisors.  (AR 326.)

The ALJ rejected Dr. Bangasan's opinion that Plaintiff was unable to work as it impedes

upon an issue reserved to the commissioner.  Plaintiff argues that the ALJ rejected the August 14,

2008 opinion because her visits to other medical providers that same day indicate that she was not

in the bed ridden condition described in the report.  However, that was not the only basis for the

1   ALJ's decision.  The ALJ gave very little weight to the August 14, 2008 opinion of Dr. Bangasan

2   because there are no indicators in the Taft Community Medical Center records that Plaintiff was

3   in the bed ridden state Dr. Bangasan described in the report.  (AR 17.)  A review of Plaintiff's

4   medical records prior to and around this time period show only vague references to depression.

5   (See AR 251, 264, 270.)  Plaintiff was seen on August 18, 2008 with no mention of depression in

6   the record.  (AR 267.)  Further, Plaintiff's mood is described as euthymic[2] on December 29, 2008,

7   January 22, 2009, February 25, 2009, and March 2, 2009.  (AR 238, 243, 245, 248.)  Therefore,

8   the medical records provide substantial evidence to support the ALJ's finding that there was no

9   indication that Plaintiff was in the condition that Dr. Bangasan stated in her August 14, 2008

10   report.

11         2.      February 19, 2009 Report

12         Dr. Bangasan completed a short form evaluation for mental disorders on February 19,

13   2009.  (AR 299-301.)  Dr. Bangasan noted that Plaintiff's speech was normal, with a rapid pace at

14   times.  Plaintiff was cooperative and she exhibited no abnormal behavior during the appointment.

15   Plaintiff was oriented in all spheres and slightly distracted.  Memory was normal and intelligence

16   was average.  (AR 299.)  Plaintiff was anxious and depressed with constricted and anxious affect.

17   Dr. Bangasan noted that Plaintiffs was "very anxious, almost overwhelmed just by day to day

18   stressors, having to deal with young children, one of them with ADHD [ ] also with residual

19   symptoms of ADHD as an adult."  Plaintiff was goal directed, and her judgment was slightly

20   impaired.  (AR 300.)  Dr. Bangasan stated that Plaintiff had made fair response to psychotherapy.

21   She was able to keep herself clean and sober from alcohol and drugs and was gradually

22   developing coping skills to face her depression and anxiety issues.  (AR 301.)

23         Plaintiff's ability to understand, remember, and carry out complex instructions was fair.

24   Her ability to understand, remember and carry out simple instructions was good.  Her ability to

25   maintain concentration, attention and persistence was fair.  Plaintiff's ability to perform activities

26   within a schedule and maintain regular attendance was poor.  Her ability to complete a normal

27

28

---

[2] According to the medical dictionary, euthymic is defined as "[m]oderation of mood, not manic or depressed."
Stedman's Medical Dictionary 678 (28th Ed. 2006).

1 workday and workweek without interruptions from psychologically based symptoms and ability

2 to respond appropriately to changes in a work setting were fair.  (AR 301.)

3       The Court is not persuaded by Plaintiff's argument that Dr. Bangasan's finding that

4 Plaintiff's ability to perform activities within a schedule and maintain regular attendance was

5 poor warrants a finding that she was disabled because it would equate to the inability to attend

6 work on a full-time sustained basis.  (ECF No 17 at 9.)  The ALJ is not bound by a treating

7 physician's opinion that a claimant is disabled as the ultimate question of disability is reserved for

8 the Commissioner.  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008); 20 C.F.R. §

9 404.1527(d).  However, the ALJ must provide specific and legitimate reasons for rejecting the

10 opinion of the treating physician.  Lester, 81 F.3d at 830-31.  Treating physician opinions are

11 entitled to deference and are weighed by the length of the treatment relationship; frequency of

12 examination; nature and extent of treatment relationship; supportability of diagnosis, consistency

13 of the opinion with the record as a whole; specialization, when the medical issue is related to the

14 specialty; and other factors that tend to support or contradict the opinion.  See Edlund v.

15 Massanari, 253 F.3d 1152, 1157 n.6 (9th Cir. 2001); 20 C.F.R. §§ 404.1527(c), 416.927(c).

16       Defendant argues that the reasons for rejecting the August 2008 assessment also applied to

17 the 2009 assessment.  (ECF No. 20 at 10.)  However, in addressing the August 2008 opinion the

18 ALJ rejected the finding that Plaintiff was bedridden, which is not the same as the finding of

19 February 2009 that Plaintiff's ability to perform activities within a schedule and maintain regular

20 attendance was poor.  Accordingly, the Court also rejects Defendant's argument that the error was

21 harmless because the ALJ addressed the August 2008 opinion of Dr. Bangasan.

22       In this instance, the ALJ did address that Plaintiff continued to have treatment from Kern

23 County Mental Health and set forth his review of the records through the time Plaintiff was

24 discharged in December 2010, noting that there were no final work restrictions issued by Kern

25 Mental Health.  The ALJ also noted that there was a gap in treatment from April 21, 2009 through

26 June 22, 2010.  (AR 17.)  The ALJ does not need to discuss all evidence that has been presented,

27 but must explain why "significant probative evidence has been rejected."  Vincent v. Heckler, 739

28 F.2d 1393, 1394-95 (9th Cir. 1984) (quoting Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981).

Other than finding that Plaintiff's ability to perform activities within a schedule and maintain regular attendance was poor, Dr. Bangasan found that Plaintiff's abilities were good or fair. The ALJ had already addressed the fact, based upon reports completed by Plaintiff and her daughter in February 2009, that:

> Plaintiff gets up at 4:30 am and makes lunch for her husband. She gets her children up for school and makes them breakfast. She testified that she walks her six-year-old to and from school, resting every two blocks. The claimant testified [she] makes meals for her husband and her children about three times a week, cleans up after them, does laundry, and shops for them.

(AR 14; see also AR 15 (Plaintiff's daughter stated "claimant wakes up early to get her husband and children ready for the day, but rests frequently. She assists her mother occasionally with picking up her younger sister from school.")

In this case, the ALJ appropriately considered that Plaintiff did not receive mental health treatment from May 2009 through June 2010. Plaintiff returned to therapy after being referred by Child Protective Services due to having a positive drug test. (AR 534.) Plaintiff attended group therapy from October 2010 through December 2010 and was released without any work related restrictions. Further review of the group therapy notes shows that Plaintiff presented in a good mood at her therapy sessions. (AR 529-35.) Plaintiff completed her treatment and was released on December 10, 2010 with an excellent prognosis.[3] (AR 534.)

---

[3] The ALJ gave some weight to the mental restrictions found by Dr. Schmidt after a consultative examination in April 2009. (AR 18.) Dr. Schmidt found Plaintiff had no marked impairments and was moderately limited but still able to function satisfactorily, interact with co-workers and the public; perform work activities consistently; maintain regular work attendance; complete a normal workday without interruptions from psychiatric conditions and deal with the usual stress encountered in a competitive work environment. (AR 18.) Dr. Schmidt found Plaintiff to be mildly depressed. (AR 432.) Plaintiff's functional level was found to be adequate with no significant impairments observed. (AR 433.) Dr. Schmidt noted that Plaintiff had a history of mild functional depression and had only sought treatment since 2005. (AR 434.) Dr. Schmidt opined that Plaintiff's ability to interact with co-workers and the public, perform work activities on consistent basis without special or additional instruction, maintain regular attendance in the workplace, complete a normal workday or workweek without interruptions from a psychiatric condition, and deal with stress encountered in a competitive work environment were moderately impaired. There was no impairment to Plaintiff's ability to follow simple instructions; manage her own funds; perform simple and repetitive tasks; maintain adequate pace and persistence to perform simple or complex tasks; or accept instructions from supervisors. Moderate was defined as still able to function satisfactorily. (AR 434.)

The ALJ also considered the opinions of the non-examining state medical experts. Significant weight was given to their opinions as the ALJ found the conclusions consistent with the medical record. (AR 19.) The state experts opined that Plaintiff had the residual functional capacity to understand, remember and carry out simple one to two step tasks; maintain concentration, persistence and pace throughout a normal workday/workweek as related to simple tasks; interact adequately with co-workers and supervisors; and can make adjustments and avoid hazards in

1    The Court finds that the ALJ provided specific and legitimate reasons for his opinion that

2    are supported by substantial evidence in the record and the ALJ did not err by failing to

3    specifically address the February 19, 2009 report of Dr. Bangasan.

4    **B.    Claimant's Testimony**

5    Plaintiff argues that the ALJ failed to give legally sufficient reasons for rejecting her

6    testimony and this requires reversal.  (ECF No. 17 at 12-15.)  Plaintiff states that she has been

7    complaining of back pain constantly since 2008.  (Id. at 14.)  Defendant contends that the ALJ

8    properly found that Plaintiff's complaints of back and knee pain were intermittent, with no

9    significant complaints until after the disability period ended.  (ECF No. 20 at 14.)

10   Plaintiff contends that the ALJ erred by finding her sincere in her testimony, but finding

11   her conditions not to be disabling under the Regulations.  In this case, Plaintiff's period of

12   disability expired on March 31, 2009, and she had to show that she was disabled by this date to

13   qualify for benefits.

14   The ALJ found that despite Plaintiff's multiple severe impairments she has made great

15   strides in her overall health, particularly in the area of substance and alcohol abuse.  (AR 19.)

16   Despite finding Plaintiff to be sincere in her testimony, the ALJ found that Plaintiff's conditions

17   are not disabling under the Regulations considered.  (AR 19.)  The ALJ found Plaintiff's back and

18   knee pain to be intermittent with no significant impairments until the fall of 2010 and the

19   impairment existed after the date that Plaintiff was last insured.  Although Plaintiff testified that

20   she would be unable to perform the equivalent of sedentary exertional work, this is not supported

21   by objective findings.  (AR 19.)  The ALJ found that, while Plaintiff's medically determinable

22   impairments could reasonably be expected to cause the alleged symptoms, her statements

23   concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the

24   extent that they are consistent with the residual functional capacity assessment.  (AR 19.)

25   The ALJ considered the adult function report completed by Plaintiff on February 4, 2009,

26   in determining that Plaintiff had mild restrictions to activities of daily living.  (AR 14.)  In the

27

28   the workplace, but would have difficulty interacting with the public.  (AR 18-19.)

1   report, Plaintiff stated that she got her husband up at 4:30 a.m. and made lunch.  (AR 190.)

2   Plaintiff would get her daughter up about an hour later and then made breakfast.  (AR 190.)  At

3   10:00 a.m., Plaintiff would walk her daughter to school and would return home by 11:30 a.m.

4   (AR 190.)  Plaintiff would walk for two blocks and rest to catch her breath.  (AR 190.)  Plaintiff

5   would do dishes, vacuum and then pick her daughter up from school at 2:30 p.m. and would be

6   home by 3:30 p.m.  (AR 190.)  Plaintiff would help her daughter with homework, prepare dinner,

7   and would be in bed by 7:00 p.m.  (AR 191.)

8       Plaintiff stated that she takes care of her husband and three daughters; making meals and

9   cleaning up after them, doing laundry, walking them to school and shopping for them.  (AR 192.

10  193.)  Plaintiff prepares meals three days a week and it takes her thirty to forty minutes.  (AR

11  193.)  Plaintiff would go out three to five times per week using public transportation.  (AR 194.)

12  She would shop for two to four hours once per week.  (AR 194.)

13      Plaintiff stated that the pain in her back wakes her up every three hours during the night.

14  (AR 192.)  She has no problems with personal care.  (AR 192.)  Plaintiff needs reminders for her

15  doctor's appointments.  (AR 193.)  Plaintiff stated she had no problems getting along with other

16  people.  (AR 196.)

17      The ALJ found that Plaintiff's daughter, Debra Clark's, third party function report dated

18  February 2009 generally mirrored the evidence taken as a whole and gave it significant weight.

19  (AR 15-16.)  Plaintiff's daughter reported that she saw her mother every day.  Plaintiff would

20  wake up early to get her husband and children up and ready for the day, resting frequently.  (AR

21  199.)  On her good days she walks her daughter to school.  Throughout the rest of the day she

22  attempts to clean.  When it is time to pick up her daughter from school either Plaintiff or Debra

23  get her.  (AR 199.)  The rest of the evening is cleaning, resting, and dinner.  (AR 200.)

24      Debra reported that Plaintiff takes care of her husband and younger daughters.  She gets

25  them up for the day, shops for them and takes care of much of their needs.  (AR 201.)  Debra

26  helps her with cleaning or walking her younger daughter to school when Plaintiff is unable.  (AR

27  201.)  Plaintiff does laundry, vacuuming, and occasionally does dishes.  (AR 202.)  Plaintiff

28  spends several hours on these chores one to three times per week.  (AR 202.)  Plaintiff goes

shopping for food and necessities twice a week for an hour or so.  (AR 203.)  Plaintiff sews and does cross stitching.  (AR 204.)  Plaintiff's medication causes her to have confusion and memory problems.  (AR 205.)  Plaintiff is able to walk a block or two and then must rest about five to ten minutes before continuing.  (AR 205.)  Plaintiff is able to maintain attention for about thirty minutes and is able to follow written instructions fairly well and can follow spoken instructions. (AR 205.)  Plaintiff does not handle stress very well, but is able to get along with authority figures and can handle changes in routine.  (AR 206.)

At the hearing on February 3, 2011, Plaintiff testified that she had just started receiving cortisone injections for her back and had begun using a cane around June of 2011 and a walker in December 2011.  (AR 43, 70.)  Plaintiff now needed help when showering and her husband was doing the majority of the cooking.  (AR 63.)  On a typical day in February 2011, Plaintiff would only vacuum the living room and do the dishes; the rest of her time was spent sitting down.  (AR 65.)  Plaintiff's daughter was doing the laundry and cleaning and her husband was doing the shopping.  (AR 67.)  Plaintiff would occasionally go with him to the grocery store if there was a cart available for her to ride in.  (AR 67.)  Plaintiff's activities were much more limited in February 2011, then she reported in February 2009.

The medical record supports the ALJ's finding that Plaintiff's back and knee pain was intermittent with no significant impairments prior to the expiration of the disability period.  The medical records from Taft Community Medical Center that show Plaintiff had mild degenerative disc disease in the mid and lower lumbar spine and possible slight exostosis of the medial metaphysic of the right tibia on December 9, 2008.  (AR 281.)  A study of Plaintiff's knee on September 20, 2010 showed no fracture or acute knee pathology.  (AR 509.)  Plaintiff had x-rays of her lumbar spine on September 3, 2010 that revealed no acute changes but mild diffuse spondylosis changes in the lumbar spine.  (AR 510.)

While a review of Plaintiff's medical records does show frequent references to her being in pain prior to March 2009, Plaintiff's complaints were generally not due to back or knee pain. During April and May of 2008 Plaintiff was seen for abdominal pain.  (AR 275, 272.)  She reported no pain on August 27, 2008 and September 10, 2008.  (AR 260, 261.)  On September 16,

2008, Plaintiff complained of pain in her right knee. (AR 265.) On September 18, 2008, Plaintiff complained of pain in her hips, lower back, lower abdomen, and right knee and rated her pain level at 8 out of 10. (AR 263.) On December 8, 2008, Plaintiff saw her chiropractor and stated her back pain was 5 out of 10. (AR 254.) On this same date she was examined for rectal bleeding and rated her pain as 10 out of 10. (AR 255.) On December 17, 2008, Plaintiff saw her chiropractor and rated her pain as 5 to 6 out of 10. (AR 255.)

On January 14, 2009, Plaintiff reported her pain level to her middle back was 3 out of 10 and she was having no problems with activities of daily living and no problems ambulating. (AR 393.) On January 22, 2009, Plaintiff complained that she was having back pain which she reported as a 3 out of 10 and her activity level was reported as normal. (AR 243.) Plaintiff reported significant pain and was referred to pain management at the end of January 2009. (AR 414, 418.) On February 25, 2009, Plaintiff saw her chiropractor and reported pain at 7 out of 10. (AR 246.) The medical record for March 2, 2009, is ambiguous as it reports a pain level of 12, but notes that Plaintiff's activity level is normal with no abnormal activity. (AR 248.)

On April 2, 2009, Plaintiff reports a pain level of 5 out of 10, with normal activity level. (AR 481.) On April 17, 2009, Plaintiff reported to Dr. Tran that her back pain on a normal day would be 5 out of 10. (AR 395.) From August 19, 2009 through August 23, 2010, Plaintiff was seen by the Taft Rural Medical Group and the visits show a normal back exam with only occasional diagnosis of back pain. (AR 501-508.) There is a second record for August 23, 2010 which indicates an abnormal finding on Plaintiff's back examination. (AR 500.)

On October 15, 2010, Plaintiff's pain management specialist, Dr. Parmar, reported that her pain level was a 9 out of 10. (AR 486.) On November 24, 2010, Plaintiff reported a pain level of 6 out of 10, and Dr. Parmar recommended a series of lumbar epidural injections to treat Plaintiff's complaints of pain. (AR 484.) As discussed above, in February 3, 2011, Plaintiff testified that she had begun using a cane around June of 2011 and a walker in December 2011 and had just started receiving cortisone injections for her back. (AR 43, 70.)

Substantial evidence in the record supports the ALJ's findings that prior to the expiration of the disability period Plaintiff's back and knee pain was intermittent with no significant

1  impairments.  The ALJ did not err in considering Plaintiff's testimony and finding that she was

2  not disabled within the meaning of the Regulations prior to the expiration of the disability period.

3                                                    **V.**

4                                    **CONCLUSION AND ORDER**

5          Based on the foregoing, the Court finds that the ALJ did not err in determining the

6  Plaintiff was not disabled prior to the termination of the period of disability.  Accordingly,

7          IT IS HEREBY ORDERED that Plaintiff's appeal from the decision of the

8  Commissioner of Social Security is DENIED.

9          IT IS FURTHER ORDERED that judgment be entered in favor of Defendant

10 Commissioner of Social Security and against Plaintiff Carolyn Louise Ray.  The Clerk of the

11 Court is directed to CLOSE this action.

12

13 IT IS SO ORDERED.

14

   Dated:   __September 10, 2013__                    _____

15                                                    UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    15